UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CATHOLIC CHARITIES OF THE DIOCESE OF FALL RIVER, MASSACHUSETTS, INC. AND ASCLEPIUS CORPORATION,

Plaintiff,

v.

THE BARNSTABLE ZONING BOARD OF APPEALS, THE TOWN OF BARNSTABLE, AND BUILDING COMMISSIONER BRIAN FLORENCE

Defendants.

Case No. CaseNumber

**Jury Trial Demanded**

# COMPLAINT

*"For I was hungry and you gave me food, I was thirsty and you gave me drink, I was a stranger and you welcomed me."*
Matthew 25:35-40

Catholic Charities of the Diocese of Fall River, Massachusetts, Inc. (Catholic Charities) seeks to fulfill this direct call to minister to those in need as an expression of their religious faith by sheltering the unhoused. The Barnstable Zoning Board of Appeals' (ZBA) wrongfully determined that Catholic Charities' sheltering the unhoused at St. Joseph's House homeless shelter does not qualify as a religious use protected by M.G.L. c. 40A, § 3, the Dover Amendment, and thus bars Catholic Charities from opening the shelter in Barnstable. In deciding that sheltering the unhoused is not a religious use and thus preventing Catholic Charities from fulfilling a mandate of their faith, the ZBA and the Town violated Catholic Charities' First Amendment rights, their Fourteenth Amendment rights, the Massachusetts Declaration of Rights,

and the Federal Religious Land Use and Institutionalized Persons Act (RLUIPA). The ZBA and the Town's religious discrimination cannot be allowed to stand.

***Parties***

1. Catholic Charities of the Diocese of Fall River, Massachusetts, Inc., is a religious nonprofit corporation with a principal office at 1600 Bay Street, Fall River, Massachusetts.
2. Asclepius Corporation is a Massachusetts nonprofit corporation and an affiliate of Housing Assistance Corporation, with a principal office at 255 Independence Drive, Hyannis, Massachusetts. Asclepius Corporation owns the real property located at 460 West Main Street in Barnstable, Massachusetts.
3. The Barnstable Zoning Board of Appeals is a duly constituted municipal board with a principal office at 367 Main Street, Hyannis, Massachusetts.
4. The Chair of the Zoning Board of Appeals is Jacob Dewey. According to its registration with the Massachusetts Secretary of State's Office, Board Chair Jacob Dewey is the manager and registered agent of Midpoint Property LLC. Midpoint Property LLC owns the real property located at 560 West Main Street, Hyannis, approximately 800 feet from the New Shelter Site, defined below.
5. The Vice Chair of the Zoning Board of Appeals is Aaron Webb. According to the registration for The Daily Paper, Inc. with the Massachusetts Secretary of State's Office, Board Vice Chair Aaron Webb is the President and Registered Agent of the corporation. The Daily Paper Restaurant is located at 644 West Main Street, Hyannis, approximately 1,600 feet from the New Shelter Site.

6. The Town of Barnstable is a municipal corporation with a Town Hall at 367 Main Street, Hyannis, Massachusetts.

7. Brian Florence is the Building Commissioner of the Town of Barnstable with an office at 200 Main Street, Hyannis, Massachusetts.

## ***Jurisdiction***

8. This Court has subject matter jurisdiction in this action under 28 U.S.C. §§ 1331 and 1343 because Counts I-IV arise under federal law. The Court has supplemental jurisdiction over the remaining counts pursuant to 28 U.S.C. § 1367.

9. This Court has personal jurisdiction over the Barnstable Zoning Board of Appeals, Town of Barnstable, and the Building Commissioner because they are local government entities and a government official in Massachusetts.

10. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because both the Plaintiffs and the Defendants are located in the District of Massachusetts and the events giving rise to the claims occurred within the District of Massachusetts.

## ***Factual Background***

### ***A. Catholic Charities***

11. Catholic Charities is a nonprofit religious organization, first incorporated in Massachusetts in 1954, that operates as an official ministry of the Roman Catholic Church within the Diocese of Fall River, which includes Barnstable. Catholic Charities carries out the charitable mission of the Church as part of its religious obligation to serve those in need in accordance with Catholic teaching and doctrine.

12. Catholic Charities' Bylaws state that the purpose of the corporation "shall be to provide human, charitable and social services within southeastern Massachusetts in faithfulness to

the gospel, and to do so with compassion, dignity, and respect through such programs as may be authorized by the governing body of the Corporation. Such programs shall be carried out in compliance with the social teaching of the Roman Catholic Church, as interpreted from time to time by the Bishop of the Diocese of Fall River." A true and correct copy of Catholic Charities Bylaws is attached as **Exhibit 1.**

13. Catholic Charities' Bylaws also state that it is organized and shall be "operated exclusively for religious, charitable and educational purposes as defined in Section 501(c)(3) of the Internal Revenue Code… and shall be subject to Massachusetts General Laws Chapter 180, the Code of Canon Law of the Roman Catholic Church, and the laws, theology, philosophy, teachings, and doctrines of the Roman Catholic Church."

14. The act of providing shelter to persons experiencing homelessness is understood within the Catholic faith to be a ministry and a religious obligation. It is one of the traditional Corporal Works of Mercy, which are acts of compassion by which Catholics are called to live out their faith through service to others.

15. The obligation to provide shelter derives from the teachings of Jesus Christ as set forth in the Gospel of Matthew, including Matthew 25:35-40, quoted above. Within Catholic doctrine, this teaching is understood as a direct call to minister to those in need as an expression of religious faith and expressly includes sheltering the unhoused.

16. As elaborated upon by Father Thomas Washburn, Dean of the Cape Cod Deanery, which includes all of the Catholic churches on Cape Cod and the Islands, Matthew 25 is "perhaps the most important text for understanding Christian service, Jesus tells us, in fact, that our final judgment will be based on the way that we have treated those on the margins. …This passage is extraordinary because Jesus does not merely encourage our

charitable behavior. He identifies himself with the poor and so to welcome the homeless is to welcome Christ himself. For Christians, this is not merely an ethical teaching, **it is a religious obligation**. Jesus presents it as a criteria for our judgment…housing for the homeless is a proclamation of our faith in action. Because of this, operating a homeless shelter is not separate from our religious mission. It is one of the most important and central ways that we fulfill it."[1]

17. This obligation to shelter the homeless and the Corporal Works of Mercy have formed part of Catholic religious doctrine and practice for more than two thousand years.
18. The Diocese structures and fulfills that religious doctrine through Catholic Charities' operation of five homeless shelters in Southeastern Massachusetts, including St. Joseph's House.
19. Catholic Charities' shelters are supported both by professional staff and through numerous volunteers from churches throughout Southeastern Massachusetts.
20. Catholic Charities does not require that those it shelters be Catholics and does not require any religious participation of its shelter guests, nor does it seek to convert them to the Catholic faith.
21. As explained by Fr. Washburn to the Zoning Board as to why Catholic Charities does not require such things, "The answer is simple. We don't require that because Jesus never required that. Jesus doesn't ask whether the hungry person belongs to the right religion. He doesn't place conditions on or constraints on the charity offered. He does not ask whether the stranger shares our beliefs or is deserving of our kindness. He commands us

---

[1] A video recording of the Zoning Board hearing is available at https://www.youtube.com/watch?v=LDkwn7YuWXA . Fr. Washburn's remarks begin at 54:11.

to serve them because they are human beings created in the image and likeness of God. Our service is not a recruitment strategy. It is an act of faith."

22. Fr. Washburn further testified that "that if you ask a Catholic why we operate a homeless shelter, the answer is not because we have a social program. The answer is because we have a Gospel. We do it because Christ commanded us to do it. We do it because He told us that when we welcome the stranger, we welcome Him. St. Francis of Assisi famously said, 'Proclaim the Gospel at all times. When necessary, use words.' St. Francis' statement is a reminder that it is not only when we are celebrating Mass in a church, or Bible study, that we engage in overt acts of religious practice. Our actions, like housing the homeless, proclaim our faith even more loudly and effectively than our words."

***B. History of St. Joseph's Shelter***

***a. Current Shelter Site***

23. Since 1979, the Housing Assistance Corporation has owned the real property located at 77 Winter Street in Hyannis (Current Shelter Site).

24. Housing Assistance Corporation is a Massachusetts nonprofit founded in 1974 to "create and preserve pathways to stable, attainable year-round housing that empowers individuals and families to stay rooted and thrive" in the Cape and Islands community.

25. From approximately 1984 through 2016, Housing Assistance Corporation operated a homeless shelter at the Current Shelter Site.

26. In 2016, Housing Assistance Corporation leased the Current Shelter Site to Catholic Charities.

27. Since 2016, Catholic Charities has operated a 50-bed homeless shelter at the Current Shelter Site.

28. When Catholic Charities leased the Current Shelter Site, it re-named the shelter St. Joseph's House.

29. The Current Shelter Site is not fully accessible and is a dated and small building which operationally constrains Catholic Charities in the fulfillment of its mission.

30. To continue to serve its mission, and particularly to be able to serve those of limited mobility, Catholic Charities sought, together with its landlord the Housing Assistance Corporation, to find a new site to relocate St. Joseph's House that would allow a fully accessible shelter to be constructed and that would provide sufficient space for Catholic Charities to both conduct its operations and co-locate supportive services for its guests.

**b. *New Shelter Site***

31. In late 2024, Catholic Charities agreed to relocate St. Joseph's House pursuant to a lease for one floor of 460 West Main Street (New Shelter Site) with Asclepius Corporation, an affiliate of Housing Assistance Corporation.

32. The New Shelter Site is on the ground floor and will be fully accessible. It is significantly larger than the Current Shelter Site, which will allow Catholic Charities to operate both an overnight shelter and a day program.

33. The New Shelter Site is adjacent to supportive services and will include a satellite health clinic.

***C. Permitting History***

34. The Barnstable Zoning Bylaw does not include homeless shelters as a use and does not permit them, whether by special permit or otherwise, anywhere in the municipality.

35. On November 11, 2025, Catholic Charities and Asclepius Corporation applied for a building permit from the Town of Barnstable for improvements to the New Shelter Site

and for a determination that the proposed use of the New Shelter Site was a religious use within the meaning of M.G.L. c. 40A, § 3 and construction commenced promptly thereafter.

36. M.G.L. c. 40A, § 3, known as the Dover Amendment, provides, in relevant part "No zoning ordinance or by-law shall prohibit, regulate or restrict the use of land or structures for religious purposes…on land owned or leased by…a religious sect or denomination…"

37. On April 6, 2026, the Building Inspector issued a decision determining that the proposed use of the New Shelter Site for a homeless shelter by Catholic Charities is a religious use subject to the protections of M.G.L. c. 40A, § 3.

38. On May 1, 2026, Maria Walsh, Trustee of the Mias Family Trust filed an appeal of the Building Inspector's decision to the ZBA pursuant to M.G.L. c. 40A, §§ 8 and 15, which provide for appeals of a building inspector's decision to the ZBA.

39. On June 10, 2026, the ZBA opened the duly-noticed public hearing on Ms. Walsh's appeal.

40. Because the crowd in attendance at the June 10, 2026 public hearing far exceeded the capacity of the hearing room, the ZBA took no testimony and immediately voted to continue the public hearing to July 22, 2026 at Barnstable High School, where a larger room was available.

41. On July 22, 2026, the ZBA opened and held the continued hearing session beginning at 7:00 p.m.

42. The Chair opened the meeting by inviting the ZBA's counsel to make opening remarks and then by inviting counsel for the Appellant, Maria Walsh, to make a presentation.

43. Counsel for Ms. Walsh agreed that the proposed use of an emergency overnight homeless shelter by Catholic Charities is a religious use and stated that his arguments were confined to whether that was the primary and dominant use of the New Shelter Site.

44. At no time did the Chair interrupt Ms. Walsh's presentation.

45. After Ms. Walsh's attorney concluded his remarks, the Chair invited Catholic Charities to make their presentation as to why the proposed use is a religious use within the meaning of M.G.L. c. 40A, § 3.

46. The Chief Executive Officer of Catholic Charities testified about how the organization has been the human services arm of the Diocese of Fall River since 1924 and provides structure for the Church's mission and explained at length the relationship between Catholic Charities and the Diocese.

47. The CEO of Catholic Charities testified repeatedly that sheltering the unhoused is work that the Catholic faith commands Catholics to undertake and to the role sheltering the unhoused plays in the Corporal Works of Mercy and Catholic Social Teaching.

48. She further testified that "the Church sees homelessness as an injustice because each person is created in the image of God….Charity is universal. It is not conditional. So we serve people of all faiths, no faith, and those struggling with all kinds of issues, including homelessness."

49. In the middle of her presentation, the ZBA Chair interrupted the CEO's presentation and asserted his incorrect belief that the Board was limited to a review of the materials before the Building Inspector at the time that the Building Inspector made his determination.

50. That is an incorrect legal interpretation and Catholic Charities' counsel so informed the Chair. But several minutes later, the Chair cut off the Plaintiffs' presentation once again,

this time interrupting Father Thomas Washburn, who was setting forth the religious basis for housing the unsheltered.

51. The Chair stated "This is just getting out of control. Can we wrap this up? Quiet in the room, please? Attorney Cox, you submitted an affidavit with the application with the building permit, correct? So why are we going back through this again?"[2]

52. The Chair continued to interrupt and preclude the Plaintiffs from presenting their case, particularly targeting the remarks of Father Washburn: "He's not talking specific to this space…we're well, I think we need to wrap it up here, I think it's going on a little too long and a little too extensive here…We have an application…that stated your position. So I'm not sure why we're going through it again because we have that in front of us and that's what Commissioner Florence made the determination based on."[3]

53. The Board then proceeded to open the public comment period.

54. One public commenter stated "I would propose something that needs to be investigated is how well they are living out the gospel…Jesus said, who is a good friend of mine, is that if anyone harms the children, they should have a millstone put around their neck and they should be cast into the sea. The particular policies of the shelter are there is no vetting, no background checks. It's been reported that there are sex offenders who are part of this population…but to put this near, for schools to put children at risk, it is not safe…I'll conclude with Saint Joseph. Joseph was homeless. Joseph found a home for his wife who was pregnant with Jesus and he didn't put them out at seven in the morning, nor did he

---

[2] Recording at 00:58:45.

[3] *Id.* at 00:59:28.

invite criminals and other challenging people to come in. In the shelter policy, there are women who have mental health problems and they are being victimized by substance abusers. That a lot in the policies that need to be investigated because it is not living out the gospel."[4]

55. Another commenter stated "they don't worship and they don't do Bible study...Look into that. You know, you don't have prayer circles or Bible studies or worshiping or masses or anything like that…"[5]

56. Another commenter stated "Unless it has changed, the format is usually that they have to be out by about 7:00 and they can't come in until about four, and that might have changed, but we have to look at the school timings on that as I'm worried about safety, I am a Catholic and I find that to be unchristian."[6]

57. Town Council member Betty Ludtke commented: "You never challenged the church. The Catholic Church is unique in the sense that they have more property than just about anybody…And if you don't ask the question, why not any of your churches for a shelter which would put them in the box? Then we only have half, you know, half the story because they're trying to take the Dover Amendment and forget that piece of it. So I don't know why the board wouldn't ask them if any of their churches would work for a shelter on Cape Cod."[7]

---

[4] *Id.* at 1:47:00.

[5] *Id.* at 2:05:00.

[6] *Id.* at 02:10:00.

[7] *Id.* at 03:12:51.

58. Following many hours of vitriolic public comment, including derogatory comments regarding Catholic Charities' faith, derogatory comments regarding shelter guests, and booing at comments from members of the clergy, the Board closed public comment and voted to close the public hearing.

59. While the Board occasionally asked for order or quiet during the booing and heckling directed at Catholic Charities' supporters, at no time did the Board remove members of the public engaging in such conduct.

60. Some Board members proceeded to make inappropriate and demeaning comments during their deliberations, such as "but is motivation the issue?...what if they're motivated to have a bar?"

61. The Board voted 4-1 to overturn the Building Inspector's decision and therefore denied the building permit.

62. On August 4, 2026, the Board filed its decision with the Town Clerk. A true and correct copy of the Decision is attached as **Exhibit 2.**

63. After recounting the various arguments made by the parties during the hearing, the Decision states that "Board members discussed whether religious faith or motivation is to qualify for Dover protection. There needs to be overt religious act, and it can't be only that the motivation is religious. The focus is on use of the property."

64. The Board's Decision makes no findings of fact or law and sets forth no reasoning in support of its Decision.

65. The Board Decision does not identify any government interest that it purports to protect by issuing its denial, let alone a compelling one, nor does it remotely purport to set forth

how denying Catholic Charities from relocating its shelter is the least restrictive means of advancing a compelling government interest.

66. The Board ignored extensive Massachusetts and Federal law making clear that it is the motivation behind the use that dictates whether the use is religious. *See, e.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1138 (10th Cir. 2013)(Holding that government acts substantially burden religious exercise if they "prevent…participation in conduct motivated by a sincerely held religious belief."); *see also, Church of Rock, Inc. v. Town of Castle Rock*, 787 F. Supp. 3d 1187, 1197 (D. Colo. 2024)(Holding that Church's desire to house the unsheltered was motivated by a sincerely held religious belief and accordingly satisfied its burden under RLUIPA); *see, also Hume Lake Christian Camps, Inc. v. Planning Bd. of Monterey*, 492 Mass. 188, 200 (2023)("[W]e look to the purpose of the particular use to which the land or structure is put.")

67. The Board Chair wrongfully curtailed Plaintiffs' presentation when their representatives were in the middle of speaking to the use of the property and how the use itself is religious, and yet the Board purported to base its Decision on this very issue.

68. The Board ignored Father Washburn's testimony that the Catholic belief is that they cannot condition the provision of shelter to the unhoused on participation in religious activities.

69. Only one Board member, Mr. Bodensiek understood the correct legal standard and stated that the use was subject to the Dover Amendment because the motivation for the shelter is religious.

70. On August 11, 2026, the Building Commissioner issued a cease and desist order preventing the Plaintiffs from continuing the ongoing interior renovations of the New Shelter Site, which the Plaintiffs received via electronic mail on August 14, 2026.

71. Following receipt of the Building Commissioner's cease and desist order, the Plaintiffs immediately directed their contractor to cease the renovation work.

**Count I: Violation of Religious Land Use and Institutionalized Persons Act (RLUIPA) (42 U.S.C. § 2000cc(a)(1)) – Substantial Burden**

72. Paragraphs 1-71 are incorporated by reference as if fully restated herein.

73. RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution (a) is in furtherance of a compelling governmental interest; and (b) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1)

74. The Zoning Board of Appeals is a government within the meaning of the statute because it is a "branch, department, agency, instrumentality, or official of" a municipality. 42 U.S.C. § 2000cc-5(4).

75. Catholic Charities is a religious institution under RLUIPA. 42 U.S.C. § 2000cc(a)(1). *See also Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025).

76. By determining that Catholic Charities' proposal to shelter the unhoused is not a religious use, the Board has implemented its land use regulations in a way that imposes a substantial burden on Catholic Charities' religious exercise.

77. Catholic Charities' religious mission is substantially burdened because it cannot fulfill its religious obligation to shelter the unhoused under the ZBA's decision because homeless shelters are not an allowed use in any district under the Barnstable Zoning By-law.

78. The imposition of this substantial burden is not in furtherance of any compelling governmental interest, nor could it possibly be when Catholic Charities operates a shelter at the Current Shelter Site today, and even if there was a compelling interest, it is not the least restrictive means of furthering such an interest, in violation of RLUIPA.

**Count II: Violation of Religious Land Use and Institutionalized Persons Act (RLUIPA) (42 U.S.C. § 2000cc(b)(2)) – Nondiscrimination**

79. Paragraphs 1-78 are incorporated by reference as if fully restated herein.

80. RLUIPA provides that "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2).

81. By determining that Catholic Charities' proposal to shelter the unhoused is not a religious use, the Board has implemented its land use regulations in a way that discriminates against Catholic Charities' religious practices.

82. The Board's decision asserts that it does not believe Catholic Charities' use is religious because it is not an "overt religious practice."

83. In 2025, the United States Supreme Court held that where eligibility for an exemption ultimately turned on "inherently religious choices (namely, whether to proselytize or serve only co-religionists), not secular criteria that happen to have a disparate impact upon different religious organizations", the law establishes a preference for certain religions based on the commands of their religious doctrine and violates the First Amendment's Anti-Establishment Clause. *Catholic Charities Bureau, Inc.*, 605 U.S. 238.

84. The *Catholic Charities* case expressly recognizes that a government cannot require that a religion condition its charitable services on requiring faith participation by those it serves.

85. Bafflingly, when presented with the *Catholic Charities* case as precedent at the hearing, the Board disclaimed its applicability and continued to assert that an "overt religious practice" was required.

86. In determining that Catholic Charities' shelter is not a religious use because it does not require its shelter guests to participate in religious activities or seek to convert those that are not of the same faith, the Board has discriminated against Catholic Charities on the basis of its religion in violation of RLUIPA.

**Count III: Violation of Religious Land Use and Institutionalized Persons Act (RLUIPA) (42 U.S.C. § 2000cc(b)(3)) – Exclusion and Limits**

87. Paragraphs 1-86 are incorporated by reference as if fully restated herein.

88. RLUIPA provides that "[n]o government shall impose or implement a land use regulation that (A) totally excludes religious assemblies from a jurisdiction or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction" 42 U.S.C. § 2000cc(b)(3).

89. Under the Barnstable Zoning By-law, a homeless shelter is not an allowed use, whether by special permit or otherwise, anywhere within Barnstable.

90. By determining that Catholic Charities' homeless shelter is not a religious use permitted under the Dover Amendment, the Board has unreasonably limited Catholic Charities' exercise of its religion as it cannot shelter the unhoused as its faith mandates anywhere in Barnstable in violation of RLUIPA.

91. The Board's Decision and the Barnstable Zoning By-law unreasonably limit Catholic Charities' exercise of its religion and its use of a religious structure within the jurisdiction in violation of RLUIPA.

**Count IV: Violation of the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)**

92. Paragraphs 1-91 are incorporated by reference as if fully restated herein.

93. "Every person who, under color of any statute, ordinances, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress." 42 U.S.C. § 1983.

94. The Board and the Town act under color of state law and are subject to 42 U.S.C. § 1983. The Board and the Town have deprived Catholic Charities of its rights under the United States Constitution.

95. The First and Fourteenth Amendments to the Constitution prohibit the Town and Board from depriving Catholic Charities of its right to freely exercise its religion, prohibit the establishment of a religion, and from doing so without due process of law.

96. In 2025, the United States Supreme Court held that where eligibility for an exemption ultimately turned on "inherently religious choices (namely, whether to proselytize or serve only co-religionists), not secular criteria that happen to have a disparate impact upon different religious organizations", the law establishes a preference for certain religions based on the commands of their religious doctrine and violates the First Amendment's Anti-Establishment Clause. *Catholic Charities Bureau, Inc.*, 605 U.S. at 250.

97. The *Catholic Charities* case expressly recognizes that a government cannot require that a religion condition its charitable services on requiring faith participation by those it serves.

98. In determining that Catholic Charities' shelter is not a religious use because it does not require its shelter guests to participate in religious activities, the Board has violated Catholic Charities' rights under the Anti-Establishment Clause.

99. Further, the Town's prohibition on homeless shelters within the Town of Barnstable together with the Board's decision precludes Catholic Charities from fulfilling its religious mission and violates the Free Exercise Clause.

100. By determining that Catholic Charities' operation of a homeless shelter is not a religious use because the Board requires Catholic Charities to engage in "overt religious conduct" and by not allowing a homeless shelter anywhere in Barnstable under the Barnstable Zoning By-law, and particularly by doing so without a fair hearing, the Town and Board violated the First and Fourteenth Amendments.

101. The Defendants' actions made clear that the Board intended to overturn the Building Inspector based on anti-religious reasons, despite clear Federal law requiring that accommodation, not merely tolerance. *See Lynch v. Donnelly*, 465 U.S. 668, 673 (1984)(Holding that 42 U.S.C. § 1983 does not require the complete separation of church and state; "it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any.") The Board's undisclosed conflicts based on members owning nearby properties, repeated cutting off and interrupting of the Plaintiffs' presentation and particularly its aggressive interruption of a member of the clergy made clear that the Board had no intention of upholding the Building Inspector's decision, nor did it intend to conduct a fair hearing.

102. Defendants do not have a compelling interest in preventing Catholic Charities from sheltering the unhoused and from having a fair hearing, nor does the ZBA's Decision even purport to set forth such an interest.

103. As a direct result of the Defendants' conduct, Catholic Charities has suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, damages, and attorneys' fees.

**Count V: Violation of Article 2 of the Declaration of Rights of the Massachusetts Constitution**

104. Paragraphs 1-103 are incorporated by reference as if fully restated herein.

105. Article 2 of the Declaration of Rights of the Massachusetts Constitution states that "No subject shall be hurt, molested, or restrained in his person, liberty, or estate, for worshipping GOD in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship." Mass. Const., pt. I, art. II.

106. The Board violated Catholic Charities' rights under the Art. 2 of the Declaration of Rights of the Massachusetts Constitution by precluding Catholic Charities from worshipping in the manner and season most agreeable to them, namely, housing the unsheltered within the relocated and fully accessible St. Joseph's House.

107. Further, the Town's prohibition on homeless shelters within the Town of Barnstable together with the Board's decision precludes Catholic Charities from fulfilling its religious mission and violates Art. 2 as Catholic Charities is prohibited from relocating St. Joseph's Shelter anywhere within Barnstable.

**Count VI: Violation of Mass. Civil Rights Act, M.G.L. c. 12, § 11**

108. Paragraphs 1-107 are incorporated by reference as if fully restated herein.

109. The Massachusetts Civil Rights Act provides that "any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court." G.L. c. 12, § 11I.

110. Section 11H of G.L. c. 12 provides that "whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth…"

111. In violation of the Massachusetts Civil Rights Act, the Defendants have interfered with the free exercise of Catholic Charities' sincerely held religious beliefs, secured by both the Constitution of the United States and by the Massachusetts Declaration of Rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A. Declare that the actions of the Board and of the Town, as alleged herein, violated the First and Fourteenth Amendment of the United States Constitution, RLUIPA, Article 2 of the Declaration of Rights of the Massachusetts Constitution, and M.G.L. c. 12, § 11.

B. Declare that Catholic Charities' operation of the St. Joseph's House homeless shelter at the New Shelter Site is a religious use and that the municipality may not withhold a certificate of occupancy for the same.

C. Enjoin the Board and the Town from further interference with the Plaintiffs' exercise of their religion by ordering the Town to timely issue a certificate of occupancy for the shelter when applied for.

D. Award compensatory and punitive damages against the Board and the Town in favor of Catholic Charities for the loss of its rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution, RLUIPA, the Massachusetts Constitution, and Massachusetts Civil Rights Act.

E. Award Plaintiffs their attorneys' fees and costs in this action in accordance with 42 U.S.C. § 1988(b).

F. Award such additional relief as the interests of justice may require.

Catholic Charities of the Diocese of Fall River, Massachusetts, Inc. and Asclepius Corporation
By their attorneys

/s/Valerie A. Moore____________________

Valerie A. Moore (BBO# 684849)
vmoore@nutter.com
Matthew J. Connolly (BBO# 676954)
mconnolly@nutter.com
Nutter, McClennen & Fish, LLP
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone: (617) 439-2000
Facsimile: (617) 310-9000

Dated: August 19, 2026